# IN THE DISTRICT COURT OF THE UNITED STATES
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# 1:05CR248-1

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Vs. ) | MEMORANDUM AND |
| ) | RECOMMENDATION |
| DANNY JOE BROOKS. ) | |
| _____ ) | |

**THIS MATTER** is before the court upon defendant's Motion to Suppress. On February 8, 2006, the undersigned conducted an evidentiary hearing at which the United States called and presented two witnesses concerning the search of a home located at 92 Arrowwood Way, Canton, North Carolina, on March 19, 2005. Defendant also called two witnesses, Jeremy Henson and Jerry Henson, who are respectively the brother and father of one of the co-defendants in this case, Michelle Henson.

Because each issue raised and argued by defendant may be resolved by reference to current case law, the undersigned will not recount in great detail the evidence presented, but will instead summarize the relevant testimony. The undersigned hereby incorporates all such testimony by reference to the official FTR recording.

I.  **Summary of the Facts**

On Friday, March 18, 2005, Jerry Henson, the owner of 92 Arrowwood Way, went upstairs in his home and discovered in a storage room a Igloo cooler, hoses and other devices used to "make that stuff," methamphetamine. Jerry Henson had rented that area of

his home to his daughter, co-defendant Michelle Henson; however, Jerry Henson testified that he would routinely go to the second floor of his home and that Michelle never told him that he could not come into that area.. Jerry Henson rented this area to his daughter in January, 2005 and she had been there for two months. After discovering the methamphetamine lab in his own home on March 18, 2005, Jerry Henson communicated his findings and his fears for his safety to his son, Jeremy Henson.

On Saturday, March 19, 2005, Jeremy Henson, during the mid morning hours, called the Haywood County Sheriff's Department, spoke with a detective, and communicated his father's concerns that a methamphetamine lab was being operated in his home. At no time did Jeremy Henson indicate to detectives that any portion of his father's home was rented to anyone. Jeremy Henson, apparently fearing reprisal from Danny Joe Brooks, agreed to meet with detectives at a place other than his father's home.

Rather than rely on second-hand information from Jeremy Henson, Deputy Christopher Shell testified that he called Jerry Henson and that Jerry Henson confirmed what Jeremy Henson had told the sheriff's department, and such information was conveyed to detectives. Jerry Henson communicated to Deputy Shell that he was concerned for the safety of himself and his family due to presence of a methamphetamine lab in his home. Jerry Henson requested that the law enforcement officers come to his home to address Mr. Henson's concerns about the methamphetamine laboratory he had found.

Having corroborated Jeremy Henson's information, Deputy Shell and Deputy Cope

next met with Jerry Henson at his home at 92 Arrowwood Way. Jerry Henson invited the officers into his home and told the officers to "follow me upstairs." Jerry Henson lead the officers to an interior staircase, lead them up the stairs, and opened an interior-type door located at a landing, which opened into the second floor. Such door was not locked, Jerry Henson did not knock, there was no testimony that such door was signed in any manner indicating that it was a separate "private residence." There was a slide lock on the inside of the door which was located to indicate control of such door from the downstairs and which if locked would prevent access to the downstairs from the upstairs. There was not a lock on the door which would prevent access to the upstairs from the downstairs. Jerry Henson then opened a bedroom door where defendant was found to be in bed with Jerry Henson's daughter, co-defendant Michelle. Surprised by the presence of the officers, Michelle yelled "Get out."

At that point the trio turned their attention away from the bedroom and Jerry Henson either opened a door to or showed officers a construction-type Igloo water cooler, located in a nearby hall storage room, that had concerned him the previous day. On this day, however, the hoses he had seen had been hooked up to the cooler and the improvised chemical condenser was actively "gassing off." Based on the deputies training and experience, they realized that this device was likely being actively used to condense anhydrous ammonia, a deadly and volatile substance used in the manufacture of methamphetamine.

Upon observing such active device, the deputies ordered the immediate evacuation

3

of the home, including defendant and co-defendant Michelle. For officer safety, the defendant as well as the co-defendant Michelle were taken to the back yard in handcuffs and placed in separate patrol vehicles. While defendant was being taken to the vehicle, Jeremy Henson arrives at the home and confronted the defendant, who tells Jeremy Henson "contact a lawyer, they can't do this." Jeremy Henson testified that such statement was made to him, not to the deputy escorting defendant. Further, Jeremy Henson testified that the deputy escorting defendant feared for the safety of the defendant inasmuch as Jeremy Henson was angrily confronting defendant for endangering his sister and father. There was no testimony that defendant ever asserted to the officers that he resided at 92 Arrowwood Way, that he had any possessory interest in such property, and the officers at no time discovered any indicia of residence in such home by such defendant, permanent or otherwise.

After securing defendants in patrol cars, deputies approached Jerry Henson again and requested that he provide written consent to the offices to search his home. Jerry Henson signed the consent to search form and allowed the officers to search his home without limitation. Jerry Henson never told the officers of any rental agreement with his daughter. After securing such written consent, Deputy Cope along with Deputy Singleton donned protective gear to conduct an initial assessment of the chemical hazzard. Upon examination of the improvised device, the deputies discovered it was gassing off and that a dangerous cloud of anhydrous ammonium was forming. At that point, the officers ventilated the home by opening windows and warned neighbors to evacuate.

4

Having determined that a dangerous condition existed, deputies secured the area until a search warrant and a destruction-of-evidence order could be secured from a North Carolina Superior Court Judge. Despite the fact that these events were occurring on a Saturday, within four hours, the deputies secured a search warrant and destruction order from Honorable Marlene Hyatt, North Carolina Superior Court Judge. Deputies thereafter seized evidence which may be used in the prosecution of defendant herein.

At the hearing, no evidence was presented that Jerry Henson ever informed any officer that he rented the upstairs to his daughter or to defendant. Further, there was no evidence that the officers observed separate mailboxes, telephone lines, electric meters, gas meters, newspaper boxes, kitchen facilities, or cable lines running to the upstairs. There was no testimony of any indicia of a separate residence on the interior door leading into the second floor. While there was evidence that an additional set of stairs exist on the exterior of the home leading to the second floor, there was no evidence that the officers knew of the existence of these stairs prior to being invited to the second floor by Jerry Henson. There was no evidence that the upstairs of the residence had a separate street address, such as 92 ½ Arrowwood Way, in the county emergency response center. Finally, Jerry Henson testified that he had an oral agreement with Michelle that she would pay him rent to live in his home and there was no testimony that defendant was a party to that agreement. There was no testimony that as part of any such agreement Jerry Henson was excluded from ingress and egress to the upstairs of his home, and Jerry Henson testified that he would regularly go

upstairs. In regard to having access to the upstairs Jerry Henson testified: "I always did."

**II.     Standing**

Defendant lacks standing to assert that evidence was seized in violation of the fourth amendment because he has failed to show that he had any legitimate expectation of privacy in Jerry Henson's home located at 92 Arrowwood Way. Where a moving party fails to allege any personal violation of a right to privacy, such party lacks standing to challenge the search. See generally United States v. Salvucci, 448 U.S. 83 (1980); United States v. Payner, 447 U.S. 727 (1980); Katz v. United States, 389 U.S. 347 (1967). The Supreme Court held in United States v. Salvucci, supra:

> The person in legal possession of a good seized during an illegal search has not necessarily been subject to a Fourth Amendment deprivation. . . . [L]egal possession of a seized good is not a proxy for determining whether the owner had a Fourth Amendment interest, for it does not invariably represent the protected Fourth Amendment interest.
> * * *
> [An] illegal search only violates the rights of those who have "a legitimate expectation of privacy in the invaded place."

Id., at 91 (citations omitted). Defendant did not testify in this matter and has not even submitted an affidavit in support of his motion, and he has failed to show what, if any, legitimate expectation of privacy he had in such residence. The burden is defendant's to establish standing. United States v. Judd, 889 F.2d 1410, 1413 (5th Cir. 1989), cert. denied, 108 L.Ed.2d 629 (1990). From the evidence this court has been presented, Jerry Henson owned the home and co-defendant Michelle Henson paid her father rent to live in that home. At most, the evidence indicates that defendant was discovered "in bed" with Michelle

6

Henson during daylight hours, but there was no evidence - - such as a suitcase, mens' clothes, or toiletries - - that would indicate that defendant had taken up residence or had even been an overnight guest in such room.

> In Jones v. United States, 362 U.S. 257, 259, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), the defendant seeking to exclude evidence resulting from a search of an apartment had been given the use of the apartment by a friend. He had clothing in the apartment, had slept there " 'maybe a night,' " and at the time was the sole occupant of the apartment. But while the holding of Jones--that a search of the apartment violated the defendant's Fourth Amendment rights--is still valid, its statement that "anyone legitimately on the premises where a search occurs may challenge its legality," id., at 267, 80 S.Ct. 725, was expressly repudiated in Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Thus, an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not.

Minnesota v. Carter, 525 U.S. 83, 89-90 (1998). As discussed above, it was defendant's burden to establish standing and he has come forward with absolutely no evidence that he was even an overnight guest in Michelle Henson's bedroom. The undersigned will recommend that the district court overrule defendant's Motion to Suppress for lack of standing.

**III.  Consent to Search**

Assuming *arguendo* that defendant does have standing, he has not shown that either the oral or written consent provided by Jerry Henson to search 92 Arrowwood Way was invalid. At the hearing, defendant argued that the deputies should have known that renting rooms is a common practice in rural areas, and that they should have realized that they were entering a separate residence when they went through the interior door leading to the second

7

floor of the home. In support of such theory, defendant argued that this court should turn to North Carolina landlord and tenant law and that such law prevents a landlord from entering property he has rented to another. This argument has long been rejected by the United States Supreme Court:

> The authority which justifies the third party consent does not rest upon the law of property, with its attendant historical and legal refinements . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the cohabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

United States v. Matlock, 415 U.S. 164, 171 n.7 (1974) (citations omitted; emphasis added). See also State v. Washington, 86 N.C.App. 235, 244-45 (1987).[1]

Under the well settled law of the United States Supreme Court, law enforcement officers and this court need not be versed in landlord-tenant law to determine whether a consent to search is valid. Instead, courts look to whether the party giving his consent has apparent authority over the property, United States v. Matlock, 415 U.S. 164, 170 (1974); Stoner v. California, 376 U.S. 483 (1964), or whether, based on the totality of the circumstances, the officer reasonably believed the third party had the authority to consent. Illinois v. Rodriguez, 497 U.S. 177 (1990); United States v. Kinney, 953 F.2d 863, 866-67

---

[1] Defendant's reliance on real property law would seem to be better directed to the issue of standing, inasmuch as courts may "consider principles of real property law, including the right to exclude, when determining the scope of rights afforded by the Fourth Amendment." State v. Boyd, 169 N.C.App. 204, 208 (2005).

8

(4th Cir. 1992)(locked closets).

Inasmuch as the deputies were proceeding under state authority at the time of the search, the deputies were reasonably guided by Chapter 15A-222(3) of the North Carolina General Statutes (which is entirely consistent with the above cited federal law), which provides that

> the consent ... must be given ... by a person who by ownership or otherwise is reasonably apparently entitled to give or withhold consent to a search of premises.

Id. The North Carolina Court of Appeals has held that Chapter 15A-222(3) is

> consistent with the language in Matlock . . . that permission may be 'obtained from a third party who possessed common authority or other sufficient relationship to the premises or effects sought to be inspected.'

State v. Kellam, 48 N.C.App. 391, 397 (1980) (quoting Matlock, supra, at 171)(emphasis deleted).

The evidence presented in this case clearly shows that Jerry Henson was a "third party who possessed common authority or other sufficient relationship to the premises," id., in that he represented to deputies that he was the owner of the property and exhibited dominion and control over such property by freely moving about therein. While defendant appears to argue that Jerry Henson conveyed his right of dominion and control to Michelle when he rented a portion of his home to his daughter, there is no evidence of record to support such an argument. Indeed, there is no evidence that defendant was a party to such agreement or has any knowledge of the terms of such agreement. The only competent evidence of record is

9

that Jerry Henson had an oral rental agreement with his daughter, and that he regularly went upstairs without protest from his daughter.

Even if this court were to fall back to North Carolina property law as defendant has argued (despite the teachings of Matlock), defendant's argument would require this court to superimpose on the oral rental agreement the most formal of terms, whereby a landlord conveys the entire "bundle of sticks" to the tenant, including the "right to exclude."

> In the bundle of rights that define private property, the greatest stick in the bundle is exclusivity of possession. Exclusivity of possession is the basis that permits the landowner to exclude anyone from his or her property.

Keyzer v. Amerlink, Ltd., 618 S.E.2d 768, 773 (N.C.App. 2005). In Hildebrand v. Southern Bell Telephone & Telegraph Co., 219 N.C. 402 (1941), the North Carolina Supreme Court held that

> The word 'property' extends to every aspect of right and interest capable of being enjoyed as such upon which it is practicable to place a money value. The term comprehends not only the thing possessed but also, in strict legal parlance, means the right of the owner to the land; the right to possess, use, enjoy and dispose of it, and the corresponding right to exclude others from its use.

Id., at 408. The Hildebrand Court went on to hold that it was this "exclusivity of possession" which is the basis for an action in civil or criminal trespass. Id. Thus, it would be defendant's argument that at the time Jerry Henson permitted officers to inspect the second floor, he had conveyed the entire "bundle of sticks" to his daughter, and was a trespasser in his own home, an argument which this court rejects as a matter of law and common sense.

The evidence presented in this case does not suggest the formal landlord-tenant

10

relationship that defendant suggests, instead it would appear at most to be a tenancy in common. There was no evidence that the "upstairs" had a separate kitchen, was serviced by separate utilities, or had a separate address. Instead, the evidence revealed that Jerry Henson could come and go to the second floor as he pleased, thereby exercising common authority over the property. Thus, what the deputies perceived under <u>Matlock</u> on March 19, 2005 - - that Jerry Henson was a person with authority to grant valid consent to the search of the second floor of his home - - is exactly what the evidence supports under North Carolina law, that he had common authority over the second floor with his daughter. <u>See</u> State v. Washington 86 N.C.App. 235, 246 (1987). Finding the consent to be valid, the undersigned will recommend that defendant's Motion to Suppress based on the invalidity of consent be overruled.

**IV.     Search Warrant**

Inasmuch as Jerry Henson had the authority to consent to the search his home, the validity of the Search Warrant issued by Judge Hyatt is not relevant.[2]   The court will, however, review the Search Warrant in order to afford reviewing court with a more complete record.

When presented with an application for issuance of a search warrant, the duty of the issuing judicial officer is clear:

---

[2]   It appears that deputies either secured the search warrant in an abundance of caution or as a prerequisite to obtaining the "destruction order," which allowed them to destroy evidence of criminal activity that would be dangerous to public safety and health if retained.

11

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband . . . will be found in a particular place.

Illinois v. Gates, 462 U.S. 213, 238 (1983). When a warrant is challenged, the role of a reviewing court is equally clear: "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Id. The reviewing court must pay substantial deference to the determination of the issuing judicial officer. Aguilar v. Texas, 378 U.S. 108, 111 (1964). The two-pronged test in Aguilar has been supplanted by a "totality-of-the-circumstances" test, which requires that the issuing magistrate make a common-sense decision. See Illinois v. Gates, supra. There is, however, no requirement that the affidavit be based entirely on the affiant's personal knowledge. See United States v. Ventresca, 380 U.S. 102 (1965).

When a search is made pursuant to a warrant, the defendant has the initial burden of showing facts supporting his allegations of a constitutional violation. United States v. De La Fuente, 548 F.2d 528 (5th Cir.), cert. denied, 434 U.S. 954 (1977). Defendant's burden is to show that there is a *prima facie* issue as to whether evidence was seized unlawfully. Nardone v. United States, 308 U.S. 338 (1939). In satisfying this initial burden, defendant must show that the search warrants issued without probable cause or were otherwise fatally defective. Batten v. United States, 188 F.2d 75 (5th Cir. 1951).

The affidavit supporting the search warrant issued by Judge Hyatt contains ample

12

support for a finding that there was a fair probability that contraband would be found at 92 Arrowwood Way. Defendant points to inconsistencies between affidavits submitted in this matter and the affidavit submitted to Judge Hyatt concerning whether the storage room door was open when the deputies arrived on the second floor, or whether Jerry Henson opened the door. This is simply irrelevant to the probable cause determination inasmuch as it was the observation of what the officers believed to be contraband - - an anhydrous ammonia generator - - that was material.

Perhaps what defendant is arguing is that the search warrant issued by Judge Hyatt is not supported by probable cause because the evidence presented to her by way of affidavit was the "fruit of the poisonous tree," i.e., that the deputies' observations of the anhydrous ammonia generator were made in violation of the fourth amendment because Jerry Henson lacked authority to open any doors on the second floor on his own home. Wong Sun v. United States, 371 U.S. 471, 487-88 (1963). As discussed above, consent was lawfully given by Jerry Henson under Matlock and such discussion is incorporated herein by reference.

Defendant also appears to argue that the deputies provided Judge Hyatt with a false statement that an anonymous source had "reported that they had witnessed Danny Joe Brooks and Michelle Henson cooking methamphetamine in a residence at 92 Arrowwood Way." See Attachment D to the Application for Issuance of Warrant. While each witness called by the government - - Deputies Cope and Shell - - were questioned about that averment and denied knowledge as to the factual basis for such a statement, defendant did not call the other

13

affiant, Deputy Singleton, to testify as to what if any basis he may have had for such averment. Thus, there exists no basis to exclude such statement from the quantum of evidence presented to Judge Hyatt. Even if the court were to exclude such averment, the affidavit contains ample evidence that would have supported issuance of the search warrant. United States v. Walton, 56 F.3d 551, 554 (4th Cir. 1995). Finally, defendant has not made the requisite showing under Franks v. Delaware, 438 U.S. 154 (1978):

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

Id., at 171. In this case, defendant was given a Franks hearing despite the lack of an affidavit. Having been afforded such opportunity, defendant neither called nor examined Deputy Singleton, one of the two deputies who attested to such statement before Judge Hyatt. In any event, defendant has failed to show that such statement concerning such observations, if untrue, were anything other than the product of "negligence or innocent mistake." Id.

Finding no merit to defendant's argument that the search warrant was unsupported by probable cause, the undersigned will recommend that defendant's Motion to Suppress evidence seized pursuant to such warrant be overruled.

14

# RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that defendant's Motion to Suppress (#52) be **DENIED** in its entirety.[3]

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen** (**14**) days of service of same. Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).

Signed: February 13, 2006

Dennis L. Howell
United States Magistrate Judge

---

[3] Defendant orally withdrew two of his four motions to suppress which were contained in his "Motion to Suppress," and has attempted to withdraw the third through a written motion, but has instead electronically re-filed his Motion to Suppress for a second time. The Clerk of this court has advised defendant of such error. See Docket Entry 100.